## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **JAMIE BUTEAU** | **Case No. 21-cr-489 (RDM)** |
| **and** | |
| **JENNIFER BUTEAU,** | |
| **Defendants.** | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jamie Buteau to 42 months of incarceration, 36 months of supervised release, restitution of $2,000, and a mandatory assessment of $100. The requested 42-month sentence represents the midrange of the Sentencing Guidelines' calculation for Jamie Buteau, which is 37-46 months of imprisonment. The government also requests that this Court sentence Jennifer Buteau to 120 days of incarceration, and consistent with the plea agreement in this case, $500 in restitution.

## I.    INTRODUCTION

Jamie Buteau, an unemployed former cook and his wife, Jennifer Buteau, a bartender, both from Ocala, Florida, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote

count, threatened the peaceful transfer of power after the 2020 Presidential Election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

The Buteaus traveled to Washington, D.C. on January 6 to protest the certification of the results of the 2020 Presidential Election. Roughly five minutes after entering the U.S. Capitol, the Buteaus were at the front of a mob that rushed to prevent police officers from pulling down a set of rolling doors that would have helped to secure parts of the Capitol building. While Jennifer Buteau and other rioters hurried to prop up the rolling doors with chairs and trashcans, Jamie Buteau went one step further; picking up a folding chair, he threw it in the direction of police, where it hit a wall and ricocheted into the arm of U.S. Capitol Police officer C.N. The Buteaus then followed behind the fleeing police officers.

The Buteaus leisurely meandered around the Capitol Visitor Center, despite the numerous and obvious signs that they should not be there. The Buteaus left the Capitol building at 2:45 p.m., but they lingered on restricted Capitol grounds for upwards of 20-30 minutes, all the while demeaning police officers who were trying to do their jobs. At around 2:57 p.m., after police deployed chemical irritants to disburse the rioters, Jennifer Buteau spat twice at police officers as Jamie Buteau looked on approvingly and video-recorded that encounter on his mobile telephone.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

The Buteaus watched and recorded video of other protesters who tried to open new breaches on the East Front of the Capitol. Before finally leaving Capitol grounds, Jamie Buteau climbed on top of an armored police vehicle, where he proudly surveyed the mob below him.

Jamie Buteau pleaded guilty to violating 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Officers). The government recommends that the Court sentence him to 42 months of incarceration and 12 months of supervised release, which is necessary to deter him and others from engaging in another violent attack the next time his political goals are frustrated by the results of an election.

Jennifer Buteau pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in any of the Capitol Buildings). The government's recommendation is supported by Jennifer Buteau's: (1) social media postings, in which she encouraged a military coup to undo the results of an election and re-install former President Trump in office; (2) actions to prevent police officers from pulling down rolling doors that could have helped to secure parts of the Capitol building; (3) spitting twice at a police officer who tried to clear an area of rioters; and (4) failure to express sincere remorse for her actions, as shown by her repeated statements in which she minimized her own culpability and shifted blame for the events of January 6 onto others.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statements of Offense filed in this case, ECF No. 54 and 55, for a short summary of the January 6, 2021 attack on the United States Capitol

3

by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 Presidential Election.

    **B.**    **The Buteaus' Role in the January 6, 2021 Attack on the Capitol**

*The Buteaus in Media and Social Media Prior to January 6*

The Buteaus, well-known adherents to QAnon,[2] a political movement based on political conspiracy theories, participated in the January 6 attack on the Capitol. Prior to January 6, the Buteaus maintained that they had a direct connection with President Trump and with "Q", the purported leader of the QAnon movement.

In the days immediately following the November 3, 2020 Presidential Election, Jennifer Buteau expressed concern on Facebook about the election results, and maintained that there was a plan to keep the former President in office. In her Facebook postings, Jennifer Buteau was clear that she wanted to be part of that plan.

> **Time** 2020-11-06 17:22:50 UTC
>
> **Type** Comments
>
> **Summary** Jennifer Buteau replied to a comment on a post from November 6, 2020. `@[████████████████] this is just a theory. Remember you must show the people, you can't just tell them! There's NO WAY Biden received the most votes in any presidential history! Our military is in control! Pray it's going to be biblical`

> **Time** 2020-11-08 17:51:29 UTC
>
> **Type** Comments

---

[2]   The Buteaus appeared in the HBO TV Miniseries, "Q: Into the Storm." Jamie and Jennifer Buteau are featured in Season 1, Episode 1 ("Disinformation is Real") and Season 1, Episode 3 ("Calm Before the Storm").

**Summary** Jennifer Buteau commented on a post from November 8, 2020. `Oh hell NO I will fight to the end! If they are NOT held accountable we are no longer America!`


**Time** 2020-11-09 05:18:41 UTC

**Type** Comments

**Summary** Jennifer Buteau replied to a comment on a post from November 8, 2020. `@[███████████████████████] you seriously think Trump golfing 2 days in a row taking pictures with a bride seems like we lost? They have fought him for 4 years you think he bow down now? No fucking way!!! We have it all! Our military is in control. I trust the plan. `


**Time** 2020-12-11 05:17:37 UTC

**Type** Comments

**Summary** Jennifer Buteau commented on a post from December 10, 2020. `Mr. President we stand with you and love you! As long as you fight for us we will fight for you! It's time to finish this and make arrest to GITMO! God bless you, the Patriots, God bless America 🇺🇸😇❤️ #WWG1WGA


*The Buteaus on January 6*

Jennifer Buteau decided that the couple would attend the "Stop the Steal" rally on January 6. The day before the rally, the Buteaus left their home in Ocala, Florida, and traveled overnight by car to Washington, D.C. On the morning of January 6, Jennifer Buteau announced their arrival in D.C. on Facebook and posted the QAnon rallying cry, "WWG1WGA", meaning "where we go one, we go all."

"**Time** 2021-01-06 09:46:07 UTC

**Story** Jennifer Buteau is in Washington D.C.

**Message** †🙏† 🇺🇸 WWG1WGA 🖤"

5

After attending the "Stop the Steal" rally near the Ellipse, the Buteaus walked along Constitution Avenue in the direction of U.S. Capitol building. The Buteaus entered the Capitol at approximately 2:25 p.m. through the Senate Wing Door, approximately 12 minutes after those doors were initially breached. As they entered, fire alarms were blaring overhead, and the Buteaus could see police in full riot gear. Jamie Buteau looked on and watched as rioters climbed into the Capitol through a broken window. After entering the Capitol building, the Buteaus traveled with the crowd towards the Crypt. In the following images, Jamie Buteau is circled in red, and Jennifer Buteau is circled in yellow.



*Image 1: A public source still image showing Jamie Buteau watching rioters climb through a broken window by the Senate Wing Door.*



*Image 2: Jamie Buteau and Jennifer Buteau entering through the Senate Wing Doors at 2:25 p.m.*

At approximately 2:29 p.m., and as part of a large mob, the Buteaus entered the elevator lobby between the Crypt and Capitol Visitor Center. Police officers had tried to establish and hold a line in the Crypt, but were outnumbered and their line broke. Retreating quickly from the Crypt, officers attempted to quickly close vertical rolling doors that would have separated the elevator lobby from a staircase leading to the Capitol Visitor Center.



*Image 3: CCTV still image showing police beginning to retreat from the Crypt and into the elevator lobby.*

As the vertical rolling doors were closing in the lobby, rioters streamed out of the Crypt and rushed to place trashcans and chairs under the doors to prevent them from closing. Jennifer Buteau joined in, and in videos taken by other rioters, she can be seen picking up a trashcan, and later a chair, and placing them beneath the rolling doors.



*Image 4: Jennifer Buteau moving a trashcan (orange circle) to block a door from closing.*

8



*Image 5: Opensource video showing Jennifer Buteau moving a chair to block a door from closing.*

Jamie Buteau, amidst the chaos of the officers' hurried retreat, picked up a chair with a metal frame, and while other rioters jeered, threw it forcefully at USCP Officer C.N. and another officer. The chair bounced off a wall behind Officer C.N. and hit him in the arm. As the officers looked up, clearly alarmed by the rioters' violence, they were taunted, as one rioter yelled, "Ohhhh, ohhhh, you're scared now, you motherfuckers!" As the officers fled, rioters continued to throw chairs and followed them down the staircase to the Capitol Visitor Center.



*Image 6: Jamie Buteau grabbed a chair in the lobby at 2:29 p.m. as officers tried to close rolling doors.*



*Image 7: As Officer C.N. (blue circle) ran beneath the closing doors, Jamie Buteau threw the chair.*



*Image 8: The chair (green circle) that Jamie Buteau threw hit a wall and then bounced onto Officer C.N. (blue circle) See Exhibits 1 [00:01 to 00:15] and 2 [00:35 to 00:59].*

Due to the actions of the Buteaus and other rioters, the rolling doors did not close and officers were not able to seal off the Capitol Visitor Center from rioters who flowed out of the Crypt. The Buteaus joined other rioters in following the fleeing officers down the staircase and into the Capitol Visitor Center's Orientation Lobby. Once in the lobby of the Capitol Visitor Center, Jamie Buteau picked up a discarded chair and began to drag it along with him as he walked, appearing to ready himself with another object he could throw at police.



*Image 9: The Buteaus entered the Capitol Visitor Center Orientation Lobby at 2:31 p.m.*



*Image 10: Jamie Buteau picked up another chair and began to drag it as he walked through the Capitol Visitor Center.*

The Buteaus remained in the Capitol Visitor Center until 2:44 p.m. During that time, they slowly walked around the Center, and stopped to observe a physical confrontation between a rioter and a police officer. After being told by the officers that they had to leave, the Buteaus walked back up the staircase and re-entered the Crypt.

The Buteaus were directed by police to exit the Capitol Building through the East Front Doors. As Jamie Buteau passed by an officer who was instructing rioters where to exit, he facetiously told him, "thank you for the tour." Jamie Buteau's tone and demeanor did not express gratitude, but instead a mocking indifference to the officers' struggles that day.

12



*Image 11: "Thank you for the tour," Jamie Buteau mocked an officer as he was instructed to exit.*

The Buteaus exited the Capitol building through the Hall of Columns South Door at 2:46 p.m. Rather than leave the restricted Capitol grounds, the Buteaus decided to stay amongst the rioters on the east side of the Capitol building. They positioned themselves outside of the East Front House Door at approximately 2:57 p.m., just as other rioters were being pushed out of that exit point from inside the building and police officers deployed chemical irritants. As officers sought to close and secure the door, the Buteaus moved directly in front of the exterior door. Jennifer Buteau was sprayed with pepper spray in her face. She became visibly furious and began to shout at police. To make her vitriol towards them even clearer, she spat twice at the police officer who sprayed her. During this encounter, Jamie Buteau stood directly behind Jennifer, tacitly approving her actions while he recorded video of that incident on his cell phone.

13



*Image 12: Jennifer Buteau spat at an officer twice at roughly 2:57 p.m. by East Front House Door as Jamie Buteau looked on and filmed. See Exh. 3 [00:30 to 01:59].*

The Buteaus remained on the east side of the U.S. Capitol building, where they intermittently chatted with other rioters or watched and filmed as officers struggled to protect the Capitol building from new breaches. During this period, Jamie Buteau climbed atop an armored vehicle, where he proudly surveyed the mob below him.



*Image 13: Jamie Buteau atop an armored police vehicle outside the U.S. Capitol.*

*The Buteau's Social Media After January 6*

Jamie Buteau texted with a friend after January 6. When the friend asked, *"why did you throw that chair?,"* Jamie Buteau responded, *"I was heated from finding out Mike Pence didn't*

*protest the electoral votes."*

On the evening of January 6, Jennifer Buteau texted her friend, L.T., proud of the Buteaus'
role in the January 6 riot, and clearly unremorseful about the violence they directly inflicted upon
police.

*L.T.: "I'm watching this shit on t.v. Trump just talked. Brought tears to my eyes. I'm sooo upset
how the media is making true patriots look so violent."*

*Jennifer Buteau: "OK we were a little violent breaking down window and doors to break in
Capitol. Then the Capitol police was pricks so we charged after them a few times.*

*L.T.: "Holy shit. You are brave!"*

The very next day, when it was clear from national news reports that the Buteaus and
other rioters might not be recognized as heroes and that they might face repercussions for their
actions, the content of Jennifer Buteau's postings radically transformed. Casting blame away
from herself and the other rioters, she blamed the police, the "deep state", and Antifa for what
occurred on January 6.

In a Facebook post from January 7, 2021, Buteau wrote the following:

*"The Capital was so called stormed by ANTIFA! Yes TRUMP supporters followed. Antifa was the
one breaking the windows. . . When I was in the Capital we did NOT destroy anything, nor did I
see others, but taking pictures, and yelling at police, police was violent at times because Antifa
Agitators that was dressed up as Trump supporters was getting in their face and trying to get us
to get in their face also."*

She continued to cast blame on police and Antifa in a Facebook post on January 8, 2021.

**Time** 2021-01-08 14:51:03 UTC

**Message** It was all Staged 🙄 the police and Antifa , undercover people.worked
together to chaos! All for the cameras. Notice how they put a Q shirt on
the Antifa guy. Boy they are scared of us, to go this far! Trump
supporters was still over a mile away listening to Trump speak, when
Antifa and paid others so called stormed the Capital. It was all

16

> orchestrated. To send out a message that Pence went against Trump
> right as we were walking to the capital and got Trump supporters upset
> and followed inside. I have too [sic] say they got what they wanted, the
> deep state is DEEP! https://youtu.be/9CsGlDehWep

Even today, Jennifer Buteau continues to blame others for her actions on January 6, as she made clear in her post-plea interview with law enforcement.

*Jamie Buteau's Post-plea Interview*

As required by his plea agreement, Jamie Buteau was interviewed on September 12, 2023. During the interview, Buteau stated that he did not remember when the decision was made to attend the 'Stop the Steal' rally. His wife ultimately decided they would go, and he willingly joined her. After a 10 to 12 hour car ride from their home in Florida, the Buteaus arrived in Washington, D.C. in the early morning of January 6 and went straight to the rally. They watched the former President give a speech and urge his supporters to "march to the Capitol." The Buteaus walked to the Capitol, hopeful that the former President would also appear.

In the interview, Jamie Buteau downplayed the numerous warning signs that he was not permitted to enter the Capitol. Although he admitted he saw a broken window, he dubiously denied seeing police barriers and altercations between rioters and police. Incredibly, he claimed not to have heard the blaring alarm that sounded as he entered the Capitol. Jamie Buteau likened the experience of entering the Capitol through the Senate Wing Door to being like "a line at an amusement park," where rioters queued to enter. Buteau stated that he followed other rioters to the Crypt. He saw police officers fleeing and pulling down sliding doors, and he also saw other rioters pick up objects and throw them at police. In a "quick reaction" decision, Buteau copied them,

picked up a chair, and threw it. After the Buteaus followed the officers down the staircase, Jamie Buteau picked up and dragged a chair behind him. Buteau maintained that he dragged the chair through the Visitor Center, not to have on hand as a weapon, but in case he later wanted to sit.

After exiting the Capitol, the Buteaus lingered on Capitol grounds for roughly 15-20 minutes. During that time, Jamie stood on top of the armored police vehicle for roughly 10 minutes. The Buteaus exited the Capitol grounds after learning of the curfew order, got back in their car and drove home to Florida.

*Jennifer Buteau's Post-plea Interview*

As required by her plea agreement, Jennifer Buteau agreed to be interviewed on September 5, 2023. During the interview, Buteau stated that she and her husband made plans to attend the "Stop the Steal" rally on January 6 to help with the turnout for the event. She had not planned to enter the Capitol, but decided to do so because "Trump said they were going to the Capitol." As the Buteaus approached the Capitol, she saw police throwing objects into the crowd, and heard flashbangs and saw smoke. Buteau stated that she regarded the police as being the aggressors in their contact with the crowd. Buteau minimized any warning signs that she should not enter the Capitol, stating that police were "just standing there" and she had regarded the Capitol as the "people's house" that she had the right to enter.

Jennifer Buteau described walking to the Crypt, and seeing police officers running from the crowd and beginning to close rolling doors. Concerned that she might be blocked in, she grabbed something made of "tin" and placed it under the rolling door to prevent it from closing. Jamie Buteau later told her that he had thrown a chair at officers because everyone else was also

throwing things. While some in the crowd rushed to follow the fleeing police officers, the Buteaus walked down the stairs. In the Capitol Visitor Center, the Buteaus watched rioters provoke police, and the couple finally decided to leave after police warned that they might be arrested.

After exiting the Capitol, the Buteaus were briefly separated. While she was talking on the phone, a police officer sprayed her with mace and it got in her mouth. Angry that her lips were burning due to the mace, she spat at the officer, but the saliva did not make contact.

Buteau stated that she wished she had never attended the rally, and that she was "set up" by the FBI and by former President Trump, who should have known that the event was a set up that would end poorly for his supporters.

## III.    THE CHARGES AND PLEA AGREEMENT

Jamie and Jennifer Buteau were arrested on June 23, 2021.

On October 29, 2021, a federal grand jury returned a superseding indictment charging Jamie Buteau with eight counts, including, Interfering with Law Enforcement During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count Two); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Three); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation 18 U.S.C. § 1752(a)(2) (Count Four); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Five); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Six); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Seven); and Parading, Demonstrating,

19

or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Eight). ECF 28. On July 24, 2023, Jamie Buteau pleaded guilty to Count Two pursuant to a plea agreement. ECF 52.

Jennifer Buteau was charged with four counts in the same Superseding Indictment, including: 18 U.S.C. § 1752(a)(1) (Count Three); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation 18 U.S.C. § 1752(a)(2) (Count Four); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Six); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Eight). ECF 28. On July 24, 2023, Buteau pleaded guilty to Count Eight pursuant to a plea agreement. ECF 53.

## IV.   STATUTORY PENALTIES

Jamie Buteau now faces sentencing on Count Two, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1). As noted by the plea agreement and the Presentence Report (PSR) issued by the U.S. Probation Office, Jamie Buteau faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

Jennifer Buteau faces sentencing on Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Jennifer Buteau faces up to six months of imprisonment and a fine of up to $5,000. Jennifer Buteau must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this

offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

As discussed below, the PSR for Jamie Buteau correctly calculates the Guidelines. That Guidelines analysis is as follows:

Count Three: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon Used | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **24** |

---

[3] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

| | |
|---|---|
| **Combined Offense Level** | **24** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>-3</u> |
| **Total Adjusted Offense Level:** | **21** |

*See* Plea Agreement, ECF 52 at ¶ 6(A).

The U.S. Probation Office calculated Jamie Buteau's criminal history as category I, which is not disputed. PSR ¶ 45. Accordingly, the government's calculation of Jamie Buteau's total adjusted offense level, after acceptance of responsibility, is 21, and Buteau's Guidelines imprisonment range is 37-46 months' imprisonment. Buteau's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter, but was not considered at the time the parties entered into the plea agreement.

Section 4C1.1 does not apply in this case for the following reason: on January 6 Jamie Buteau engaged in physical violence against police officers fleeing the Crypt. "Heated from finding out Mike Pence didn't protest the electoral votes," Buteau grabbed a chair, and using it as a dangerous weapon, threw it with force at the fleeing officers. The chair hit a wall and ricocheted into the arm of police officer C.N.

The government is aware of at least two cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence, *United States v. Gundersen*, 21-cr-137 (RC) and *United States v. Baquero*, 21-cr-702 (JEB).

Jennifer Buteau's violation of 40 U.S.C. § 5104(e)(2)(G) is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration for Jamie Buteau and 120 days of incarceration for Jennifer Buteau.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, the Buteaus' criminal conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The Buteaus observed police officers be overwhelmed and outnumbered by a violent mob in the Crypt. They saw the police line break and saw the officers run for their safety. They observed the police officers desperately try to pull down vertical rolling doors to protect themselves and to secure parts of the Capitol from the mob.

Despite seeing all this, the Buteaus joined in some of the worst aspects of that mob. While other rioters tried to prop up the rolling doors and taunted the fleeing police, Jamie Buteau grabbed a chair and threw it forcefully at police officers, where it hit a wall and ricocheted into Officer

C.N. By placing objects under the rolling doors, Jennifer Buteau helped to ensure that the officers would not succeed in closing the rolling doors, and that rioters would access other parts of the Capitol building. After the Buteaus left the Capitol, they continued to take actions that hindered officers' abilities to secure the Capitol building. Remaining in front of the East House Front Door, Jennifer Buteau was pepper sprayed by police looking to clear the area. Her response to being pepper sprayed was to spit twice at the officer. Jamie Buteau climbed on top of an armored police vehicle. The nature and circumstances of the offenses committed by Jamie and Jennifer Buteau were of the utmost seriousness, and fully support the government's recommended sentence of 42 months for Jamie Buteau and 120 days of incarceration for Jennifer Buteau.

### B.  The Buteaus' History and Characteristics

Jamie Buteau worked previously as a cook at a hospital in Rhode Island. He has been unemployed for over a decade and collects disability income.

Jamie Buteau was convicted of willful trespass in 2006 and was on probation for one year. He has no additional criminal history.

Jennifer Buteau works as a server and bartender. She has no criminal history.

The Buteaus are known for their appearances in the 2021 HBO documentary miniseries about QAnon, *Q: Into the Storm*.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. The Buteaus' criminal conduct on January 6 was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to these particular defendants also weighs heavily in favor of a lengthy term of incarceration.

In Jamie Buteau's interview, he stated that he felt regret immediately after assaulting Officer C.N. He also stated that the ankle bracelet that he has worn since his arrest is a constant reminder of his actions, and that he wishes that he had never entered the Capitol on January 6.

The government credits Jamie Buteau for his acceptance of his actions and his expressions of remorse. At the same time, the government cannot fully reconcile his present-day expressions

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

of remorse with his repeated misconduct on January 6. Buteau assaulted an officer who was being pursued by an angry and violent mob of which Buteau was a part. After the assault, Buteau dragged a chair behind him through the Visitor Center, ostensibly to have another object on hand that he could throw. When he finally left the Capitol building, he mocked the police officer who escorted him out, thanking him "for the tour." Once outside the Capitol building, he filmed his wife as she spat twice at a police officer trying to clear the door of rioters. He lingered on the East side of the Capitol, filming struggling officers as they worked to prevent new breaches. And then he climbed on top of an armored police vehicle to proudly survey the damage inflicted by the mob. His actions on January 6 show that a sufficient sentence of incarceration is necessary so that he understands that his conduct towards law enforcement can never be justified nor repeated.

The need for the sentence to provide specific deterrence to Jennifer Buteau also weighs heavily in favor of a term of incarceration. While she regrets being a criminal defendant in this case, she has expressed little or no remorse for her actions on January 6, and she regards herself as a victim of a government conspiracy. Already on January 7, 2021, Jennifer Buteau began an early campaign to shift blame for the January 6 attack onto others—including Antifa, police and the FBI. On January 8, 2021, she posted on Facebook "It was all Staged 🙄 the police and Antifa, undercover people. worked together to chaos!" She has remained steadfast in those views.

In the GiveSendGo fundraising site that she created for her husband (this site has been removed but was active as recently as May 2023), Jennifer Buteau railed against this pending criminal case, stating "We was [sic] arrested on 6/23/21 by our corrupt FBI for attending January 6. We thought we could use our first amendment rights inside the capital to tell how displeased we

was with the stolen election, and how corrupt they were."



In her September 5, 2023 interview, Jennifer Buteau stated that she "wish[ed] that she never went" to the rally, but also stated she was "set up" by the FBI, and by the former President, who should have known what would happen to his supporters.

Jennifer Buteau's failure to accept responsibility and her lack of remorse demonstrate her inability to understand the harm that she helped foment on January 6. A period of incarceration is necessary to ensure she does not participate in the next violent protest in pursuit of her political goals.

**E.    The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

**F.      Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being

asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*Section 3553(a)(6) analysis for Jamie Buteau*

The Court may consider, for reference, the sentence imposed in *United States v. Clayton*, 21-cr-139 (RCL). There, the defendant pled guilty to two counts of violating 18 U.S.C. § 111(a), resulting in a guidelines range of 30–37 months' incarceration. Clayton was in the area near the inaugural stage on the west side of the Capitol and did not enter the building. Clayton resisted officers' attempts to clear the Upper West Terrace by grabbing multiple officers' police shields and stole a police baton that an officer had lost during the struggle. Judge Lamberth sentenced Clayton to a guidelines sentence of 30 months' incarceration and 24 months of supervised release.

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Mikhael Slye*, 22-cr-334 (JEB), the defendant pleaded guilty to violating 18 U.S.C § 111(a)(1). Like Jamie Buteau, the defendant entered the Capitol through the Senate Wing Door, traveled to the Crypt, and remained inside the Capitol for roughly 30 minutes. After exiting the Capitol, the defendant walked to the North Door, where he joined a violent mob. As a group of officers came out through the North Door, the defendant grabbed a bicycle rack and threw it into an officer's path, causing the officer to fall and become injured. The defendant then proceeded to shout vulgarly at the officers and spat at them. The adjusted offense level in this case was 24 (not 21 as in Buteau's case) because the Court applied the bodily injury enhancement under U.S.S.G. § 2A2.2(b)(3). Judge Boasberg, departing significantly downward from the Guidelines range due to the defendant's significant medical issues, sentenced Slye to 30 months of incarceration and 18 months of supervised release.

In *United States v. Creek*, 21-cr-645 (DLF), the defendant pleaded guilty to violating 18 U.S.C. § 111(a)(1). Creek came to Washington, D.C. prepared to engage in violence. Whereas Buteau helped overrun the police line by the Crypt, Creek helped breach a police line of bike racks at the West Plaza. Whereas Jamie Buteau threw a chair forcefully at a police officer, Creek hit an officer in the face shield of his helmet, and then pushed another officer in the shoulders and kicked him. Creek also picked up a strap with metal buckles and threw it in the direction of officers. Judge Friedrich sentenced the defendant to 27 months of incarceration and 12 months of supervised release.

In *United States v. Vassallo*, 22-cr-325 (ABJ), the defendant pleaded guilty to violating 18 U.S.C § 111(a)(1). Similar to Jamie Buteau, the defendant joined and copied the violent actions of

the mob. Gathering with other rioters on the Upper West Terrace, the defendant ignored police officer requests that the mob disburse, and then pushed a U.S. Capitol Police officer so hard that the officer almost fell off a landing. Noting the defendant's acceptance of responsibility and expressions of remorse, Judge Berman Jackson sentenced the defendant to 18 months of incarceration and 36 months of supervised release.

*Section 3553(a)(6) Analysis for Jennifer Buteau*

In *United States v. Baranyi*, 21-cr-62 (JEB), the defendant pleaded guilty to violating 18 U.S.C. § 1752(a)(1), and was sentenced by Judge Boasberg to 90 days of incarceration. Baranyi, like Jennifer Buteau, was in the Crypt and joined a mob in overrunning police officers that had tried to establish a line to stop the rioters' advance. After leaving the Crypt, Baranyi made his way to the door of the House of Representatives Chamber, where he watched other rioters smash windows over the shoulders of officers guarding the door. Whereas Baranyi posted on social media after January 6 advocating the overthrow of the U.S. government, Jennifer Buteau was active on social media before January 6 advocating for a military coup. Neither Baranyi nor Jennifer Buteau expressed remorse for their actions.

In *United States v. Smith*, 21-cr-290, the defendant pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G) and was sentenced by Judge Walton to 90 days of incarceration. Both Jennifer Buteau and Smith took actions that impacted law enforcement's abilities to secure the Capitol. Whereas Smith removed iron benches that were used as barricades on the inside of the Rotunda doors and also attempted to open the Rotunda doors before he was stopped by three officers, Buteau placed a chair and trashcan underneath rolling doors near the Visitors Center. Whereas

Smith returned to the Rotunda to join a crowd that pushed against the police line and resulted in a successful breach of the Rotunda doors, Buteau was part of a mob that overran the police line in the Crypt.

In *United States v. Bromley*, 21-cr-250, the defendant pleaded guilty to violating 18 U.S.C. § 1752(a)(2) and was sentenced by Judge Friedman to 90 days of incarceration. Whereas Bromley verbally berated a USCP officer who guarded a door to the Capitol building, Jennifer Buteau spat at an officer who had sprayed chemical irritants to clear rioters from the East House Front Door. Bromley encouraged and helped his cousin attempt to breach an unguarded door—while Buteau joined a mob that overran a police line in the Crypt.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer C.N., did not suffer bodily injury as a result of Jamie Buteau's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Jamie Buteau must pay $2,000 in restitution, which reflects in part the role Buteau played in the riot on January 6.[8] Plea Agreement at ¶ 13. As the

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9

plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783.14" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Buteau's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 13.

The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Jennifer Buteau must pay $500 in restitution, which reflects in part the role she played in the riot on January 6.[9] ECF No. 53, Plea Agreement at ¶ 12.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 42 months of incarceration, 3 years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment on Jamie Buteau, and sentence Jennifer Buteau to 120 days of incarceration and $500 in restitution. Those sentences will protect the community, promote respect for the law, and deter future crime by imposing restrictions on the defendants' liberty as a consequence of their behavior.

---

(D.D.C. 2012) (citations omitted).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:    */s/ Melanie Krebs-Pilotti*
MELANIE KREBS-PILOTTI
Trial Attorney -ATR
601 D Street NW
Washington, D.C. 20530
CA Bar No. 241484
(202) 870-7457
melanie.krebs-pilotti2@usdoj.gov

*/s/ Carolina Nevin*
CAROLINA NEVIN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
NY Bar No. 5226121
(202) 803-1612
carolina.nevin@usdoj.gov