UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JAMIE N. BUTEAU and<br>JENNIFER P. BUTEAU,<br><br>    Defendant. | Case No. 1:21-cr-489-RDM<br><br>**DEFENDANT JAMIE BUTEAU'S SENTENCING MEMORANDUM** |

Defendant Jamie Buteau, through counsel, submits this sentencing memorandum.

## I. Introduction

On July 24, 2023, pursuant to a plea agreement, Mr. Buteau pled guilty to one count of assaulting, resisting, or impeding certain officers (in violation of 18 U.S.C. § 111(a)(1)). Mr. Buteau made his initial appearance on June 23, 2021 and was released from custody on June 25, 2021. A sentencing hearing in this case is scheduled for November 20, 2023.

## II. Sentencing Guidelines Calculation

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" when a district court is imposing a sentence. *Peugh v. United States*, 569 U.S. 530, 536 (2013) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). "The post-*Booker* federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines . . . ." *Id.* at 541.

Mr. Buteau has no objections to the sentencing guidelines calculation in the PSR.  Doc. 75, ¶ 90.  The total offense level is therefore 21 and the criminal history category is I.  As a result, the advisory sentencing guidelines range is 37–46 months of incarceration.

### III.   Recommended Sentence

After considering the advisory sentencing guidelines, a district court must then consider "the arguments of the parties and the factors set forth in § 3553(a)." *Peugh*, 569 U.S. at 536.  For the reasons below, the Court should sentence Mr. Buteau to one year and one day of incarceration followed by a term of supervised release.

#### A.   History and Characteristics of Mr. Buteau

This is one of the few cases where primary sources are better able to describe a defendant than an attorney.  Through the numerous letters attached as Exhibit 1, the Court has a very clear picture of who Mr. Buteau is and what kind of life he has tried to build for himself.  However, some features of Mr. Buteau's life are worth highlighting.

Mr. Buteau is a generous man of modest upbringing and modest means.  He was born and raised in Rhode Island.  His mother was more or less a single parent for most of his childhood.  His family was poor and received government financial assistance.  Mr. Buteau played sports and stayed out of trouble.  He was an average student, however he struggled with reading and writing.

Mr. Buteau met his wife Jennifer in 1992.  They have been married for 25 years.  Together, they have three children.  Mr. Buteau was deeply involved in raising his children and continues to be a critical part of their lives.  His youngest son, Jordan, is

developmentally disabled and still lives with Mr. Buteau and his wife. Jordan Buteau relies on his parents for certain aspects of care and support.

Besides raising his own children, Mr. Buteau fostered three of his nieces and nephews when their parents could no longer care for them. This included a niece who was struggling in her teen years and a nephew diagnosed with severe autism. Mr. Buteau also opened the door of his home to other children who lacked parental love and supervision. No matter who was under his roof, Mr. Buteau welcomed them and made them part of his family.

In 2009, Mr. Buteau's life significantly changed. One day, he was outside watching his two-year-old special needs nephew. During a few inattentive moments, the boy fell into a swimming pool and nearly died from drowning. This incident psychologically devastated Mr. Buteau. In the time that followed, Mr. Buteau was diagnosed with posttraumatic stress disorder, major depressive disorder, and panic disorder with agoraphobia. Due to his significant depression, Mr. Buteau repeatedly showed up to work late and lost his job that he had for nearly 20 years. Shortly before he stopped working, he also sustained a significant back injury that to this day continues to cause him physical pain. The mental and physical toll on Mr. Buteau was too much for him. In June 2011, Mr. Buteau was involuntarily hospitalized after overdosing on Wellbutrin because of his depressed state. After his release, he was no longer suicidal but was undoubtedly a changed man. In 2012, Mr. Buteau began receiving Social Security Disability Insurance benefits and has not been able to return

to work. He is currently under the care of a medical provider and is prescribed Lexapro and Adderall.

Mr. Buteau's loss of work led to significant financial hardship for his family. They defaulted on their mortgage, and their house went into foreclosure. Because the cost of living in Rhode Island was beyond their means, Mr. Buteau and his wife considered relocating to Florida. Mrs. Buteau had a brother in Central Florida and they first intended to move to Orlando. After they discovered housing costs in Orlando were more than they could afford, the Buteaus settled on Ocala, Florida, a small rural city in North Central Florida. The Buteaus managed to purchase a mobile home in the Golden Hills Mobile Home Park (shown in the picture below), where they have lived for almost 10 years.



If there is one quality that describes Mr. Buteau more than any other, it is his generosity. He has helped many people in different ways. Mr. Buteau has positively shaped the lives of his children, his nieces and nephews, neighbors, and friends. As a

father and grandfather, Mr. Buteau is intimately connected with his children's lives and provides them with love, emotional support, guidance, and wisdom.

So many people have benefitted from Mr. Buteau's generosity and continue to do so. Removing him from the community will have a significant impact on several lives. The Court should consider this when determining an appropriate sentence in this case.

**B.    Nature and Circumstances of the Offense**

The Court is aware of the general background regarding the events of January 6, 2021 and there is not much to say that hasn't already been said. What follows therefore is a description of how and why Mr. Buteau came to Washington, D.C. that day. Mr. Buteau also directs the Court to the FD-302 report memorializing his debriefing interview with the government on September 12, 2023, which is attached as Exhibit 2.

Until the 2016 presidential election, Mr. Buteau was never involved in politics or even paid much attention to it. He was a registered Democrat who voted for President Obama twice. After President Trump became the Republican nominee in August 2016, Mr. Buteau's brother called him. His brother said President Trump was different from other politicians and Mr. Buteau should listen to what he has to say. Mr. Buteau remembers going on YouTube and watching a video called *You Can't Stump the Trump.* The video was a compilation of clips of President Trump's statements at the Republican primary debates. After watching this, Mr. Buteau was amazed. He felt President Trump was honest and authentic, seemed to have common sense, and was willing to tell it like it is. Mr. Buteau felt President Trump did not

seem like a politician.  Mr. Buteau's feelings towards President Trump were strengthened even more when he compared him to Hillary Clinton, who received the Democratic nomination.

Some time between the Republican National Convention and Election Day in 2016, Mr. Buteau registered as a Republican and attended his first rally in support of Donald Trump.  Over the next few years, Mr. Buteau recalls attending at least 11 Trump rallies.  These events were always peaceful gatherings.  Mr. Buteau never saw anyone fighting or engaging in disorderly conduct.  No one showed up in any kind of military gear, such as helmets or body armor.

After President Trump's inauguration in January 2017, Mr. Buteau became disillusioned with the mainstream media.  He felt they were telling lies and mischaracterizing things to undermine President Trump.  Later that year, Q, the anonymous author of the online posts that would become the foundation of the movement known as Q-Anon, published their first posts.  Mr. Buteau remembers reading these at the time, but he was uneasy about them and did not think they were authentic. Over time, however, he increasingly turned to Q as he felt the mainstream media continued to be intentionally deceptive.  Mr. Buteau wanted to read something he felt he could believe.  He thought Q's posts encouraged him to question the truth of what politicians and the media were saying.  He began gathering his news and information from sources that supported President Trump.  Even still, Mr. Buteau wasn't entirely sure Q was who they said they were (a member of government with inside information), and remained somewhat skeptical of Q's posts.

Mr. Buteau's view of Q changed after attending a Trump rally in 2018 in Tampa, Florida. Before the rally, Mrs. Buteau purchased a ten-inch-tall cutout of the letter "Q" that was made of wood. She painted it and brought it to the rally. Mr. Buteau thought his wife was foolish for doing this because he was sure security would take it from her before they entered the rally. To his astonishment, a security guard looked at it and allowed them to enter with the wood Q. During the rally, while President Trump spoke, he pointed to the wood Q the Buteaus held up above their heads. This was the final proof Mr. Buteau needed to fully believe Q was real and that the information being posted was legitimate.

In the days and weeks after this 2018 rally, the Buteaus received a torrent of attention from various media organizations. They gave numerous interviews about the rally, Q, and Q-Anon. They eventually appeared in the documentary miniseries titled *Q: Into the Storm*. The newfound fame greatly impacted Mr. Buteau. He further questioned anything the mainstream media had to say about President Trump. Enjoying his newfound notoriety, he felt he could not speak against any Q post without risking the loss of the fame and attention.

By January 6, 2021, Mr. Buteau had attended at least eleven Trump rallies. He and his wife were even in Washington, D.C. in mid-November 2020 for what was billed as the "Stop the Steal" rally. After being fed weeks and weeks of disinformation and propaganda regarding the 2020 election results, Mr. Buteau was, like millions of Americans, doubtful of the legitimacy of President Biden's victory.

Mr. Buteau is unsure when exactly he and his wife planned to go to Washington, D.C. for the rally on January 6, 2021. He does remember that on January 5, 2021, his wife worked that day and the two of them got in the car that evening and drove 10–12 hours from Florida to Washington. They arrived before dawn and got no sleep the night before.

Mr. Buteau had absolutely no reason to anticipate what would unfold that day. He did not come to Washington, D.C. intending to enter the Capitol, let alone do anything violent. He did not bring any weapons with him or objects that could have been used as a weapon, such as a flagpole. He did not organize, plan, or encourage the events of January 6. When he arrived at the rally, he remembers being very surprised to see so many people with objects that would normally not be allowed through security (such as flagpoles, helmets, and other military gear).

Mr. Buteau remembers hearing President Trump speak. Although there is continued debate about whether President Trump's speech was protected by the First Amendment, there can be little doubt that it motivated and set in motion the mob that eventually descended on the Capitol. At a minimum, the nearly 75-minute speech encouraged attendees at the rally to "fight like hell" and go to the Capitol because the election was "rigged" and "stolen."

By the time the speech was over, Mr. Buteau thought President Trump would be joining the crowd in a march to the Capitol. He still did not think this would result in actually entering the building. When he arrived at the lawn surrounding the Capitol, Mr. Buteau became swallowed up in a crowd that was making its way up the

stairs to the Upper West Terrace. He described this experience as being similar to waiting in a line for a ride at a theme park. This is clearly seen in surveillance footage depicting the Upper West Terrace stairs next to the scaffolding that was erected for the inauguration. For the government's benefit, the particular video file showing Mr. Buteau in this line is named "0925 USCG 00 Upper Terrace West - 2021-01-06_19h19min32s.mp4," and Mr. Buteau can be seen beginning at 3:05 of the video.

After ascending the stairs, Mr. Buteau entered the building through an open door on the Senate side. Moving with the crowd, he ended up in the Crypt with several hundred other people. At some point, the small number of police officers keeping the crowd contained began to retreat. The officers tried to lower vertical rolling doors to secure the area, however several people managed to get the doors to reverse and open by putting chairs and other objects under them. Amid the shouting and chaotic environment, people began throwing chairs towards the police. Worked up by the crowd, Mr. Buteau picked up a chair and threw it. The chair hit a wall, bounced off the wall, and hit Officer C.N. in the back of the arm. Officer C.N. remained where he was for a few moments then retreated. Mr. Buteau also backed away from the area.

A few minutes after throwing the chair, Mr. Buteau descended a set of stairs towards the Capitol Visitor Center. He remained in the building for another 15 minutes. During that time, he was not destructive or violent. After exiting the building, Mr. Buteau and his wife went to the east side of the Capitol building, where they stayed for an unknown amount of time to observe the crowd. Mr. Buteau left

the Capitol grounds after learning that a curfew had been imposed. He and his wife then drove back to Florida.

Mr. Buteau was, as were many that day, initially a bystander who was fed a steady diet of heated rhetoric. His status changed from bystander to offender when he entered the Capitol, and Mr. Buteau is of course responsible for his own actions and poor choices. But the Court should not lose sight of the broader environment in which Mr. Buteau did those actions and made those poor choices.

Immediately after throwing the chair towards Officer C.N., Mr. Buteau was disappointed in himself. As he told the government during his debriefing interview on September 12, 2023, this case "flipped a switch" in his mind and has led him to no longer be interested in politics. He is mad at himself for what he did on January 6, 2021, and he regrets going to Washington, D.C. The GPS monitor attached to his ankle is a continuing reminder of the consequences of his actions and a motivating factor that led him to lose any interest in politics. Mr. Buteau, who struggles with reading and writing, intends to personally address the Court at the time of sentencing to discuss this in more detail.

### C. Success with Pretrial Release

Mr. Buteau has been on pretrial release since June 25, 2021. The conditions of release include GPS monitoring and a travel restriction. During his time on pretrial release, Mr. Buteau has complied with all conditions, including continuing his mental health treatment and passing all his drug tests. He has done everything asked of him and demonstrated his ability to follow and respect the law.

### D. Loss of Social Security Disability Insurance Benefits

Any time Mr. Buteau spends in prison will have a profound financial impact on his family. Mr. Buteau has received Social Security Disability Insurance benefits since 2012. He and his family rely on this source of income for their basic survival. Nearly 60% of the Buteaus' monthly income comes in the form of his disability benefits. After Mr. Buteau has been incarcerated for more than 30 days, his benefits will be suspended. *See* 42 U.S.C. § 402(x)(1). Knowing that his sentencing was coming, Mr. Buteau and his wife of course tried to save some money but that proved nearly impossible with a budget mostly based on a fixed income. Mrs. Buteau may be able to increase her hours as a server, but that will come nowhere close to meeting the shortfall. Mr. Buteau's developmentally disabled son, who relies on his parents for support, will also be impacted as his mother struggles to pay household expenses on her own.

Every family is of course impacted when someone is incarcerated. However, when a person is unable to work and receiving disability benefits, there is no way for them to mitigate the future loss of income that results from incarceration. They cannot simply get a second or third job, or work as many hours as possible. Therefore, this unique situation warrants the Court's consideration.

### E. Need to Avoid Unwarranted Sentencing Disparities

As of November 2023, hundreds of defendants charged with crimes in connection with the events of January 6, 2021 have been sentenced. The government, as it has done in other cases, selected a few cases that it believes are most comparable

to Mr. Buteau's case. While the government has identified cases involving similar charges, the underlying conduct in those cases is quite different than what occurred in Mr. Buteau's case. Most importantly, this was not a "hands on" incident and did not (thankfully) involve bodily injury. Mr. Buteau did not strike or touch anyone with his hands as did Cale Clayton, Kevin Creek, and Salvatore Vassallo. He did not cause or intend to cause bodily injury like Mikhael Slye. Second, Mr. Buteau did not express vulgarity towards law enforcement. Aside from the conduct for which he pled guilty, the video evidence shows he was snarky but otherwise respectful and calm towards the police. For example, on his way out of the Capitol, he saw a police officer trying to get inside through a closed door. Mr. Buteau realized the door was magnetically locked and tried to tell another police officer one of their colleagues wanted to enter the building.

Counsel has scoured other cases for those that involved offense conduct most like that of Mr. Buteau. The one that is closest in time, location, and conduct is *United States v. Bradley Rukstales*, No. 1:21-cr-41-CJN-5 (D.D.C. Jan. 7, 2021). There are still, of course, certain differences between them. However, those differences suggest Mr. Rukstales's conduct was worse than Mr. Buteau's.

As with Mr. Buteau, Mr. Rukstales was in the elevator lobby between the Crypt and the Capitol Visitor Center when officers were trying to close vertical rolling doors. Seconds after Mr. Buteau threw the chair that is the subject of this case, Mr. Rukstales appears on camera handling his own chair. The Court can see this in the below still image from the video the government submitted as Exhibit 2 to its

12

sentencing memorandum. Mr. Rukstales is indicated with a red circle and Mr. Buteau is indicated with an orange circle. Mr. Rukstales's very distinctive clothing makes him easy to identify.



According to the government's sentencing memorandum in Mr. Rukstales's case, seconds after police officers retreated from the elevator lobby, Mr. Rukstales followed their same pack and descended the stairwell from the elevator lobby to the Capitol Visitor Center. Once there, he picked up a chair and "hurled it in the direction of where the officers had retreated down the corridor." Doc 130 at 4, *United States v. Bradley Rukstales*, No. 1:21-cr-41-CJN-5 (D.D.C. Jan. 7, 2021). Mr. Rukstales (circled in red) is shown throwing the chair (circled in yellow) in the below photo. At the time Mr. Rukstales threw the chair, the officers were "dozens of feet away from Rukstales and were not in danger of being hit." *Id.* at 6.



After "hurling" the chair, Mr. Rukstales (seen circled in red in the photo below) "continued walking toward the end of the corridor, looking in the direction of the officers' defensive line." *Id.* There, he and others refused police commands to leave the building. A "melee ensued" between officers and the uncooperative group. *Id.* at 7. Mr. Rukstales remained in the middle of one of the "scrums" and at one point stretched out his arm in the direction of a police officer. *Id.* at 9. That officer then took Mr. Rukstales to the ground and tried to arrest him. Mr. Rukstales resisted, refused to cooperate, and, in the end, three police officers were needed to take him into custody.

/ / /

/ / /

/ / /

/ / /



The government charged Mr. Rukstales with three misdemeanors. Pursuant to a plea agreement, Mr. Rusktales pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol building). He was sentenced to 30 days of imprisonment.

The reality is that Mr. Buteau and Mr. Rukstales find themselves in markedly different situations because of the government's charging decisions. However, the Court can and should look beyond those charging decisions to the underlying conduct and outcome of Mr. Rukstales's case. Each case involves a man who threw a chair at a police officer. In one, the chair bounced off a wall and hit a police officer in the back of the arm. In the other, the chair did not hit anyone. Whereas Mr. Buteau exited the Capitol building and was later arrested without incident, Mr. Rukstales resisted arrest to such a degree that it took three police officers to apprehend him. These differences cannot possibly justify an additional 41 months of jail time in Mr. Buteau's case, which is what the government is seeking.

15

### F. Minimal Relevance of Sentencing Guidelines

It is entirely implausible that either Congress or the United States Sentencing Commission could have anticipated what occurred on January 6, 2021. Is there a guideline that covers the crime of assault? Of course. But the advisory guidelines are so generalized that they completely overlook the reality of what occurred on January 6, especially with respect to Mr. Buteau's case. For example, there is no advisory guideline addressing what happens when the President of the United States "repeated knowingly false claims of election fraud to gathered supporters, falsely told them that the Vice President had the authority to and might alter the election results, and directed them to the Capitol to obstruct the certification proceeding and exert pressure on the Vice President to take the fraudulent actions he had previously refused." Doc. 1 at 6, *United States v. Donald J. Trump*, No. 1:23-cr-257-TSC, (D.D.C. Aug. 1, 2023).

Mr. Buteau's case—and many of the January 6 cases—are so far beyond the orbit of the advisory guidelines that their applicability is limited. The government suggests this means the advisory guidelines understate the severity of the offense conduct. That may be true with respect to the organizers, leaders, planners, and individuals predisposed to violence. But not for someone like Mr. Buteau. The Court should therefore lean more heavily on the other statutory sentencing factors to determine an appropriate sentence.

/ / /

/ / /

### G.     Factors in 18 U.S.C. § 3553(a)(2)

Mr. Buteau recognizes the seriousness of his choices. He agrees with the government that a sentence of incarceration is warranted. But not a sentence of 42 months.

Aside from a stale misdemeanor trespass conviction for which he pled no contest after playing video games in his mother-in-law's home, he has led a law-abiding life and this type of conduct is truly an anomaly. Many people describe him as a person who has never shown signs of violence, does not have a temper, and rarely even raises his voice. A lifetime of peaceful existence and an aversion to conflict weigh in favor of a lesser punishment.

The fact of being charged in this case has had a tremendous deterrent effect on Mr. Buteau. He says the two nights he spent in jail when he was initially arrested felt like two years. He describes that experience as the worst moment of his life. Mr. Buteau continues to feel shame and remorse regarding his actions. He has also completely lost any desire to participate in politics, and he even avoids political commentary online.

The sentences handed down in cases resulting from January 6, 2021 have clearly had no deterrent on the man most responsible for the events of that day— President Donald Trump. He continues to make many of the same statements about the 2020 election that he told his supporters on January 6, 2021. According to all recent polling, President Trump is the heavy favorite to be Republican nominee in the 2024 presidential election. Several polls also show that he is in a close race with

President Biden. This country may very well again face a similar situation to January 6, 2021. With tens of millions of supporters, it is hard to believe that the sentence in Mr. Buteau's case will have any kind of general deterrent effect in the event President Trump decides to unleash another mob. Instead, the greatest general deterrent to the repetition of the events of January 6, 2021 is stronger support for law enforcement, advance planning, and crowd control.

**IV.   Conclusion**

Mr. Buteau does not want to go to prison. His family and friends do not want him to go to prison. The defense's recommendation of a prison sentence of one year and one day is not made on a whim. It is a prison sentence for a felony. That is incredibly serious for someone who, at 50 years old, has never spent a night in jail before his arrest in this case. Such a sentence punishes, deters (to the extent that is possible), and protects the public from Mr. Buteau's minimal risk of any future crimes. But it also adequately accounts for the broader context in which Mr. Buteau acted and reflects his unique circumstances. A sentence of one year and one day of incarceration followed by a term of supervised release is therefore the sentence that is "sufficient, but not greater than necessary" to further the purposes of federal sentencing. 18 U.S.C. § 3553(a).

/ / /

/ / /

/ / /

/ / /

Dated this 16th day of November, 2023.

        Respectfully submitted,

        A. Fitzgerald Hall, Esq.
        Federal Defender

        /s/ Douglas J. Stamm
        Douglas J. Stamm, Esq.
        Florida Bar No. 0092069
        Assistant Federal Defender
        400 N. Tampa St., Suite 2700
        Tampa, FL 33602
        Telephone: (813) 228-2715
        Fax: (813) 228-2562
        E-mail: douglas_stamm@fd.org

        Attorney for Jamie Buteau

## CERTIFICATE OF SERVICE

I certify that on November 16, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

        /s/ Douglas J. Stamm
        Assistant Federal Defender